The defendant appeals from a judgment in favor of the plaintiffs in their action based upon implied warranty and fraud in the sale of a residence. We affirm.
This controversy arose when the basement wall of the Torans' side of a duplex collapsed on May 8, 1978, less than two years after their purchase of it. This action was filed, a jury trial ensued, and the plaintiffs were awarded a verdict in the amount of $27,000.00. The defendant contends that the trial court erred in submitting the case to the jury over his motion for a directed verdict and for denying his motions for judgment notwithstanding the verdict and for a new trial.
Defendant raises three issues: (1) whether there was any evidence of reliance on the part of the plaintiffs; (2) whether the principles of implied warranty applied to the sale of premises previously rented; and (3) whether there was any evidence justifying an award of punitive damages.
The defendant, Waites, constructed the duplex house. He rented one side to a family named Henderson who occupied their side about two months earlier than the Torans began to occupy theirs. When the Torans were "househunting," they saw a "rent or sell" sign in the front yard of the duplex. They contacted Waites and ultimately agreed to rent the new but unoccupied side. Within two weeks or a month, they began negotiating with Waites to purchase the side they occupied. The purchase agreement was ultimately executed on June 14, 1976, some three months after the Torans began their occupancy, and the closing occurred on August 31, 1976.
The tendencies of the evidence disclose that the house in question was constructed on a relatively steep hillside, with a nine-foot-high basement wall made of hollow concrete blocks without reinforcement or bracing. A hollow block wall divided the two units. Eight to ten feet of fill dirt was piled next to the outside of the hollow basement wall against which rainfall flowed directly. The backyard was not landscaped to direct the flow of water and, there being no gutters on the roof, water discharging therefrom accumulated at the point where the basement wall eventually collapsed. There was expert testimony adduced by the plaintiffs to establish that this construction did not accord with good construction practice and caused the wall to fail. Defendant, who was present at the construction site daily, acknowledged telling plaintiffs during their negotiations that he had built the house in a good and workmanlike manner.
While plaintiffs were renting their home, and about two weeks before closing the sale, the basement wall of the home next door in the duplex collapsed. Not only were the buildings and walls built exactly alike, but the later collapse of the plaintiffs' wall was almost identical to the first collapse. Waites contended at trial that the first collapse was caused by lightning, but it was shown that his insurance carrier denied Waite's own claim for damages on the ground that the collapse was due to hydrostatic pressure. Indeed, following the first collapse, when Mrs. Toran asked defendant to examine their basement wall, he assured her after his examination that it was "just sweating a little bit" even though he added braces to the first wall, but not to the Torans' basement wall.
 I
On the first issue defendant insists that the plaintiffs produced no evidence that they relied upon any misrepresentation made by defendant. He points us to the education and experience of the plaintiffs and to the fact that they employed their own contractor to check the property after their discussions with the seller. Moreover, he asserts, the plaintiffs had lived in the duplex for approximately one month before they purchased it, thus putting them in the position of one who has the opportunity to investigate and does not do so.Cf. Myers v. Moody, 259 Ala. 638, 67 So.2d 891 (1953). *Page 129 
The evidence discloses through the testimony of Mrs. Toran, however, that the purchasers were relying upon the seller's representation of good workmanship. After testifying to her unfamiliarity with house construction, she was asked:
 Q. Who were you depending on when you bought that house to see that it was built in a good manner, and didn't have walls collapsing?
. . . .
A. Mr. Waites.
That testimony and the other evidence concerning the wall were sufficient to make reliance an issue of fact for the jury. OldSouthern Life Ins. Co. v. McConnell, 52 Ala. App. 589,296 So.2d 183 (1974).
 II
Did the principles of implied warranty apply in this case? InSims v. Lewis, Ala., 374 So.2d 298 (1979), the elements of that cause of action were delineated: (1) The plaintiffs purchased a new residence from the defendants; (2) The defendants had constructed the residence; (3) The residence had not been inhabited by any other person or persons prior to the purchase of the residence; (4) The residence was constructed by the defendants for purposes of sale and was sold in a defective condition, which defective condition impaired the intended use of the residence, namely, inhabitation; (5) Plaintiffs were not aware of the defective condition and were not possessed of any knowledge or notice by which they could have reasonably discovered it; and (6) By reason of the defective condition, the plaintiffs suffered damages in the form of a decrease in the fair market value of the residence.
The defendant contends that the establishment of certain of these elements is missing, viz., this was not a single family residence and consequently the warranty is inapplicable. Moreover, he contends that the residence was not "new" because it had been rented by the plaintiffs before they purchased it, and, in addition, that they had notice of the defect beforehand.
To limit the definition of "residence" in the context of implied warranty by excluding a duplex residence would be sophistical, in our opinion. The word "residence" means "a building used as a home." Webster's Third New International Dictionary (1971) at 1931. Nothing is contained in this Court'sSims decision which would cast such a restriction upon the subject of the implied warranty approved therein, and it would be unreasonable to establish such a restriction. We have no hesitation in stating that the term "residence" in this frame of reference includes a "home" which is one side of a duplex home. Accord, Cochran v. Keeton, 287 Ala. 439, 252 So.2d 313
(1971). Having repudiated the doctrine of caveat emptor in favor of protection for new home owners, we cannot re-impose it to discriminate against those who find it necessary or desirable to purchase that new home in the form of a duplex.
Was the residence rendered "not new" because the plaintiffs rented it for two weeks to a month before negotiating to purchase it?
It should be noted that in Sims, supra, the purchasers moved into the home after it was completed but before actually purchasing it. We judicially know that it is not uncommon for home buyers to move into a newly constructed home and to make payments in the form of rent up until the time of closing. In this case the plaintiffs followed that course — their duplex was not quite completed when they moved in, the difference being that they entered apparently under a rental agreement and did not enter purchase negotiations immediately. Under Sims
what is required is that the "new" residence not have been inhabited by others prior to purchase. Here, no others had inhabited the residence. The short length of time between their occupancy and their negotiations for purchase, coupled with the fact of additional work having been done by the builder after their occupancy began and the fact that the dwelling had been constructed "for sale or rent," made a jury question on the issue of whether the duplex was "new." The jury obviously *Page 130 
resolved that issue in the plaintiffs' favor.
Did plaintiffs have notice of the defect which would preclude their recovery?
That the construction of the basement wall in question was a latent defect, not visible to observation, is unquestioned and one, therefore, which could not have been readily discovered either by the plaintiffs or their own inspector. Indeed, neither the plaintiffs nor their own inspector saw the wall being constructed, and there is nothing contained in the record to indicate that they had any reason to suspect a deficiency in its construction. Defendant, on the other hand, was on the job site frequently. Nevertheless, when the basement wall of the other component collapsed, he reinforced it in the course of repairs while reassuring plaintiffs that their basement wall was free from problems and that the collapse of the companion wall was due to lightning. Under these facts the jury was justified in finding, as they must have found, that plaintiffs were neither aware of the defective condition nor possessed of any knowledge by which they reasonably could have discovered it.
 III
The record supports the conclusion that plaintiffs relied upon an affirmative representation that the house was built in a good and workmanlike manner. Given the manner and construction of the basement wall(s) in relation to the contour of the site and the inadequate provision for drainage, coupled with the defendant's conduct with regard to the neighboring basement wall and his statements relating thereto, a jury question was presented on whether or not the defendant made a willful misrepresentation. See Code of 1975, § 6-5-101.
The plaintiffs adduced expert testimony that:
 Nobody in good conscience is going to build a nine-foot hollow-block retaining wall, and put nine foot of dirt against it. First of all, hydrostatic pressure is going to knock it down.
Expert testimony also characterized this construction practice as "extremely dangerous." Such testimony, when coupled with defendant's positive representations, allowed the jury to infer either a positive intention to deceive on the part of the defendant, Geraldine Smith v. Big Three Motors, Inc., Ala.,412 So.2d 1222 (1982), or a recklessness amounting to the same thing, Loch Ridge Construction Co., Inc., v. Barra, 291 Ala. 312, 280 So.2d 745 (1973); Hall Motor Co., Inc. v. Furman,285 Ala. 499, 234 So.2d 37 (1970); thus the plaintiff argues that punitive damages are allowable. However, inasmuch as the jury verdict fell within the range of testimony offered on the amount of actual damage suffered,[1] we need not elaborate on this issue.
Having found no reversible error under the issues raised, we conclude that the judgment must be, and is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] The plaintiff produced evidence of compensatory damages ranging from $24,594.00 to $30,487.00.